United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 25, 2002 Decided May 24, 2002 

 No. 99-1348

 American Corn Growers Association, 
 Petitioner

 v.

 Environmental Protection Agency, 
 Respondent

 State of Michigan, Department of 
 Environmental Quality, et al., 
 Intervenors

 Consolidated with Nos. 99-1349, 99-1350, 
 99-1351, 99-1352, 99-1357, 99-1358, 99-1359, 
 01-1111, 01-1112, 01-1113

 On Petitions for Review of an Order of the 
 Environmental Protection Agency

 Peter Glaser argued the cause for Industry petitioners and 
intervenors on the BART Issues in Case Nos. 99-1348, 

99-1349, 99-1350, 99-1351, 99-1352, 99-1356, 99-1357, 
99-1358 and 99-1359. With him on the joint briefs were Paul 
M. Seby, Henry V. Nickel, F. William Brownell, Michael L. 
Teague, Kevin L. Fast, David M. Flannery, Kathy G. Beck-
ett, Scott D. Goldman, Harold P. Quinn, Jr., William H. 
Lewis, Jr., and Michael A. McCord.

 Kevin L. Fast argued the cause for Industry petitioners in 
Case Nos. 01-1111, 01-1112 and 01-1113. With him on the 
joint briefs were Peter Glaser, Paul M. Seby, Henry V. 
Nickel, F. William Brownell, and Michael L. Teague.

 David S. Baron argued the cause and filed the briefs for 
petitioner Sierra Club.

 Jennifer M. Granholm, Attorney General, State of Michi-
gan, Thomas L. Casey, Solicitor General, and John Fordell 
Leone, Assistant Attorney General, were on the briefs for 
intervenor State of Michigan.

 Pamela S. Tonglao, Kenneth C. Amaditz, and H. Michael 
Semler, Attorneys, U.S. Department of Justice, argued the 
causes for respondents. With them on the brief was M. Lea 
Anderson, Attorney, U.S. Environmental Protection Agency.

 Erick Titrud argued the cause for intervenors State of 
Maine, State of New Hampshire, State of Vermont, and 
Tribal and Environmental intervenors. With him on the joint 
brief were Ann Brewster Weeks, Vickie L. Patton, William 
G. Grantham, G. Steven Rowe, Attorney General, State of 
Maine, Philip T. McLaughlin, Attorney General, State of 
New Hampshire, Maureen D. Smith, Senior Assistant Attor-
ney General, and William H. Sorrell, Attorney General, State 
of Vermont.

 Peter Glaser, Henry V. Nickel, F. William Brownell, Mi-
chael L. Teague, Kevin L. Fast, Paul M. Seby, Harold P. 
Quinn, Jennifer M. Granholm, Attorney General, State of 
Michigan, John Fordell Leone, Assistant Attorney General, 
David M. Flannery, Kathy G. Beckett, William H. Lewis, Jr., 

and Michael A. McCord were on the joint brief for Industry 
and State intervenors, in support of respondents.

 Mark L. Shurtleff, Attorney General, State of Utah, Fred 
Nelson, Assistant Attorney General, and Susan M. McMicha-
el were on the brief for amici curiae State of Utah and State 
of New Mexico Environment Department, in support of re-
spondent EPA.

 Before: Edwards, Randolph, and Garland, Circuit Judges.

 Opinion for the Court filed Per Curiam.

 Opinion concurring in part and dissenting in part filed by 
Circuit Judge Garland.

 Per Curiam: In 1999, the Environmental Protection Agen-
cy promulgated a final rule to address regional haze. See 
Regional Haze Regulations, 64 Fed. Reg. 35,714 (July 1, 
1999). The Haze Rule calls for states to play the lead role in 
designing and implementing regional haze programs to clear 
the air in national parks and wilderness areas that have been 
classified as "mandatory class I Federal areas,"1 such as 
Yellowstone National Park, Grand Canyon National Park, and 
Shenandoah National Park. See 40 C.F.R. ss 81.401-.437 
(listing areas that have been designated as Class I areas 
where visibility is an important value). Numerous petitioners 
now challenge the Haze Rule. We vacate the rule in part and 
sustain it in part.

 I. Introduction

 "Regional haze," as EPA defines it, is visibility impairment 
caused by geographically dispersed sources emitting fine 

__________
 1 "Class I" areas include all international parks, national wilder-
ness areas which exceed 5,000 acres in size, national memorial parks 
which exceed 5,000 acres in size, and national parks which exceed 
6,000 acres in size and which were in existence on August 7, 1977. 
See 42 U.S.C. s 7472(a). The term "mandatory class I Federal 
areas" is defined as "Federal areas which may not be designated as 
other than class I." Id. s 7491(g)(5). At the time the Haze Rule 
was promulgated, there were 156 Class I areas across the country. 
See 64 Fed. Reg. at 35,714.

particles and their precursors into the air. See 64 Fed. Reg. 
at 35,715. The emission and movement of sulfur dioxide, 
oxides of nitrogen, and fine particulate matter from sources, 
such as power plants, contribute to haze. See id. Fine 
particulate matter scatters and absorbs light. See id.

 Haze has degraded visibility in most of the country's na-
tional parks and wilderness areas. See id. The average 
visual range in many Class I areas in the western United 
States is 100 to 150 kilometers - which is just one-half to two-
thirds the estimated visual range that would exist without 
manmade air pollution. See id. In most of the eastern 
United States, the average visual range is less than 30 
kilometers - or about one-fifth the visual range that would 
exist under estimated natural conditions. See id.

 Before 1977, the Clean Air Act (the "CAA" or the "Act") 
"did not elaborate on the protection of visibility as an air-
quality related value." Chevron U.S.A., Inc. v. EPA, 658 
F.2d 271, 272 (5th Cir. 1981). But in 1977, "[i]n response to a 
growing awareness that visibility was rapidly deteriorating in 
many places, such as wilderness areas and national parks," id. 
at 272, Congress added s 169A to the Act. See Clean Air Act 
Amendments of 1977, Pub. L. No. 95-95, s 128, 91 Stat. 685, 
742 (current version at 42 U.S.C. s 7491). Section 169A 
established as a national goal the "prevention of any future, 
and the remedying of any existing, impairment in visibility in 
mandatory class I areas which impairment results from man-
made air pollution." See 91 Stat. at 742 (current version at 42 
U.S.C. s 7491(a)(1)). Congress directed EPA to issue regula-
tions requiring states to submit State Implementation Plans 
("SIPs") containing emission limits, schedules of compliance, 
and other measures necessary to make reasonable progress 
toward meeting the national visibility goal. See 91 Stat. at 
743 (current version at 42 U.S.C. s 7491(b)(2)). In addition, 
Congress required states to address possible visibility impair-
ment caused by currently-operating large stationary sources 
which had been in operation between 1962 and 1977. See 91 
Stat. at 743 (current version at 42 U.S.C. s 7491(b)(2)(A)).

 Congress also gave EPA the responsibility of promulgating 
regulations under s 169A to "assure ... reasonable progress 
toward meeting the national goal." See 91 Stat. at 742-43 
(current version at 42 U.S.C. s 7491(a)(4)). EPA issued its 
first regulations in 1980. See 45 Fed. Reg. 80,084 (Dec. 2, 
1980). The 1980 visibility regulations, which apply to states 
containing at least one Class I area, addressed visibility 
impairment reasonably attributable to one source, or to a 
small number of sources. See id. at 80,085. EPA limited the 
reach of the 1980 regulations to impairment attributable to 
specific sources and deferred any action on regional haze 
attributable to multiple sources located across broad geo-
graphic regions because there was insufficient data regarding 
the relationship between emitted pollutants, pollutant trans-
port and visibility impairment. See id. at 80,086.

 In 1990, Congress amended the Clean Air Act again, add-
ing s 169B in an attempt to prompt EPA to further address 
visibility impairment in national parks and wilderness areas. 
See Clean Air Act Amendments, Pub. L. No. 101-549, s 816, 
104 Stat. 2695 (1990) (current version at 42 U.S.C. s 7492). 
Section 169B requires, among other things, that EPA under-
take research to identify "sources" and "source regions" of 
visibility impairment in Class I areas, consider designating 
transport commissions to study the interstate movement of 
pollutants, and establish a transport commission for the 
Grand Canyon National Park. See 42 U.S.C. s 7492.

 EPA established the Grand Canyon Visibility Transport 
Commission ("GCVTC") in 1991 to assess information about 
the adverse impacts on visibility in and around sixteen Class I 
areas on the Colorado Plateau region and to provide policy 
recommendations to EPA to address such impacts. See 56 
Fed. Reg. 57,522 (Nov. 12, 1991). The GCVTC issued its 
report to EPA in 1996. Then in 1997 EPA issued a notice of 
proposed rulemaking with regard to regional haze, see 62 
Fed. Reg. 41,138 (July 31, 1997), noting that advances in 
scientific and technical knowledge, including analyses provid-
ed by the GCVTC, had made it possible for EPA to target 
region-wide visibility impairment. After receiving more than 
1,300 comments to the proposed rule, EPA published the final 

Haze Rule on July 1, 1999. See 64 Fed. Reg. at 35,714. The 
final Haze Rule reaches all states because, EPA concluded, all 
states contain sources whose emissions are "reasonably antici-
pated to contribute to regional haze in a Class I area." Id. at 
35,721. Under the Haze Rule, a state must develop and 
submit a SIP that provides for reasonable progress toward 
achieving "natural visibility conditions" in the national parks 
and wilderness areas in that state. See 40 C.F.R. 
s 51.308(d)(1). SIPs addressing regional haze in an "attain-
ment" area must be submitted within one year of the date the 
area is designated as "attainment," and revised SIPs for 
"non-attainment" areas must be submitted within three years 
after the designation. See id. s 51.308(b)(1)-(2).

 The Haze Rule, for the most part, does not specify what 
control measures a state must implement in its initial SIP. 
See 64 Fed. Reg. at 35,721 (noting that the determination of 
what specific control measures must be implemented "can 
only be made by a State once it has conducted the necessary 
technical analyses of emissions, air quality, and the other 
factors that go into determining reasonable progress"). But 
the rule does require states to: (1) provide for an improve-
ment in visibility in the 20 percent most impaired days; (2) 
ensure that there is no degradation in visibility during the 20 
percent clearest days; and (3) determine the annual rate of 
visibility improvement that would lead to "natural visibility" 
conditions in 60 years. See 40 C.F.R. s 51.308(d)(1); see also 
id. s 51.301; 64 Fed. Reg. at 35,734. A state may not adopt 
a rate of improvement that would achieve natural visibility 
conditions in more than 60 years unless it demonstrates that 
the 60-year rate is unreasonable. See 40 C.F.R. 
s 51.308(d)(1)(ii).

 The Haze Rule also provides that each state must develop a 
long-term strategy for achieving its visibility improvement 
goals. This strategy must include the identification of all 
major stationary sources subject to Best Available Retrofit 
Technology ("BART") requirements. See id. s 51.308(e). In 
identifying sources subject to BART, the Haze Rule calls for 
states to use a group rather than a source-by-source ap-
proach. See 64 Fed. Reg. at 35,740 (providing that a state 
should find a source subject to BART "if it can be shown that 

the source emits pollutants within a geographic area from 
which pollutants can be emitted and transported downwind to 
a Class I area") (italics added). In addition, when establish-
ing emission limits for BART sources, states must consider 
the improvement in visibility that would result if the technolo-
gy were used at all comparable BART sources (rather than 
the improvement that a particular device at a particular 
source would accomplish). See 40 C.F.R. s 51.308(e)(1)(ii)(B).

 The various petitioners and intervenors in this consolidated 
case raise numerous challenges to the Haze Rule. In Part II 
we address the claim that EPA acted contrary to law in 
establishing a group rather than a source-by-source approach 
to BART determinations. In Part III we address the claims 
of industry petitioners in Case Nos. 01-1111, 01-1112, and 
01-1113 that EPA acted without legal authority and in anarbi-
trary and capricious manner in promulgating the "natural 
visibility" goal and the "no degradation" requirement in the 
regional haze regulations. Finally, in Part IV, we address 
the challenges raised by the Sierra Club - namely that EPA 
failed to set reasonable criteria for measuring or assuring 
reasonable progress, and that EPA acted contrary to law in 
extending the statutory deadline for submission of state haze 
control plans.

 II. BART Issues

 Under s 169A of the Act, each state must review all 
BART-eligible sources - meaning all major stationary sources 
built between August 1962 and August 1977 - to determine 
whether the sources emit "any air pollutant which may rea-
sonably be anticipated to cause or contribute to any impair-
ment of visibility" in a Class I area.2 42 U.S.C. 
s 7491(b)(2)(A). After deciding that a BART-eligible source 
emits a pollutant which may reasonably be anticipated to 

__________
 2 A "major stationary source" is a source that has the potential 
to emit 250 tons or more of any pollutant. See 42 U.S.C. 
s 7491(g)(7).

cause or contribute to Class I visibility impairment, the state 
then must determine what is the best available retrofit tech-
nology for controlling emissions from that source. See id. 
Under the Act, states must take the following five factors into 
consideration when deciding what BART controls to place on 
a source:

 the costs of compliance, the energy and nonair quality 
 environmental impacts of compliance, any existing pollu-
 tion control technology in use at the source, the remain-
 ing useful life of the source, and the degree of improve-
 ment in visibility which may reasonably be anticipated to 
 result from the use of such technology.
 
Id. s 7491(g)(2).

 The Haze Rule interprets and implements these statutory 
BART provisions in two main ways. First, the Haze Rule 
requires states to "find that a BART-eligible source is 'rea-
sonably anticipated to cause or contribute' to regional haze if 
it can be shown that the source emits pollutants within a 
geographic area from which pollutants can be emitted and 
transported downwind to a Class I area." 64 Fed. Reg. at 
35,740 (italics added). In other words, states must subject 
BART-eligible sources to BART requirements even absent 
empirical evidence of that source's individual contribution to 
visibility impairment in a Class I area so long as the source is 
located within a region that may contribute to visibility 
impairment. See id. at 35,740; see also Br. for EPA at 26-27. 
EPA explained in the preamble to the Haze Rule that this 
sort of "collective contribution" approach was "consistent with 
that taken in the programs for acid rain and ozone, programs 
which also address regional air quality problems caused by 
transported pollutants." 64 Fed. Reg. at 35,740; see also 63 
Fed. Reg. at 57,376.

 Second, the Haze Rule provides that once a state has 
decided that a particular source is subject to BART and is 
considering what BART controls to place on that source, the 
state must analyze "the degree of visibility improvement that 
would be achieved in each mandatory Class I Federal area as 
a result of the emission reductions achievable from all sources 

subject to BART located within the region that contributes to 
visibility impairment in the Class I area." 40 C.F.R. 
s 51.308(e)(1)(ii)(B) (italics added). This means that of the 
five statutory factors to be considered by states when deter-
mining BART controls, see 42 U.S.C. s 7491(g)(2), only four 
factors (the costs of compliance, the environmental impacts of 
compliance, any existing pollution control technology in use at 
the source, and the remaining useful life of the source) are 
considered on a source-specific basis. The Haze Rule re-
quires states to consider the fifth statutory factor (the degree 
in improvement) on a group or "area wide" basis.

 Industry petitioners attack EPA's decision to use a group 
rather than a source-by-source BART approach, arguing that 
the language, statutory structure, and legislative history of 
s 169A make it clear that the Haze Rule runs afoul of the 
Act. See Br. for Industry Pet'rs and Intervenor in Case Nos. 
99-1348, et al. at 13. For the reasons that follow, we grant 
the petition for review, vacate the BART rules, and remand 
to EPA.

 In the Haze Rule, EPA extracts one of the five statutory 
factors listed in s 169A(g)(2) and treats it differently than the 
other four. See 64 Fed. Reg. at 35,741 (providing that only 
"the degree in improvement in visibility that would be expect-
ed at each Class I area as a result of imposing BART" is to 
be considered on a group rather than a source-specific basis). 
In effect, EPA bifurcates the states' determination of the 
appropriate BART emission limitations for specific sources. 
States must first estimate possible emission reductions on a 
source-by-source basis based on the application of the tech-
nology, the cost, time for compliance, energy and nonair 
environmental impacts, and the remaining useful life of the 
source. See id.; see also 40 C.F.R. s 51.308(e)(1)(ii)(A). 
"Taking these factors into account allows the State to arrive 
at an estimate of the 'best system' of retrofit control technolo-
gy for a particular source." 64 Fed. Reg. at 35,741. States 
must then calculate the degree in improvement in visibility 
that would be expected at each Class I area as a result of 

imposing BART on all sources subject to BART. See id.; see 
also 40 C.F.R. s 51.308(e)(1)(ii)(B).

 EPA argues that its bifurcated approach to determining 
appropriate BART controls is permissible because 
s 169A(g)(2) is unclear about how a state must analyze 
anticipated visibility improvement. See Chevron U.S.A., Inc. 
v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984). 
We cannot agree. The Haze Rule's splitting of the statutory 
factors is consistent with neither the text nor the structure of 
the statute. See 42 U.S.C. s 7491(g)(2). All five 
s 169A(g)(2) factors inform the states' inquiries into what 
BART controls are appropriate for particular sources. Al-
though no weights were assigned, the factors were meant to 
be considered together by the states. The language of 
s 169A(g)(2) can be read in no other way. To treat one of 
the five statutory factors in such a dramatically different 
fashion distorts the judgment Congress directed the states to 
make for each BART-eligible source. This is most apparent 
with respect to the states' duty to take into account "the costs 
of compliance" in deciding not only whether to order an 
individual source to install any new pollution control equip-
ment, but also what type of equipment - or as the statute 
puts it, what type of "retrofit technology." How is a state to 
determine what is too costly (and what is not) for a particular 
source? The statute answers that the state must consider the 
degree of improvement in visibility in national parks and 
wilderness areas that would result from the source's installing 
and operating the retrofit technology. EPA has a far differ-
ent answer: in assessing the cost of compliance imposed on a 
source, the state may not consider the degree to which new 
equipment at a particular source would help cure the haze in 
some distant national park. Under EPA's take on the stat-
ute, it is therefore entirely possible that a source may be 
forced to spend millions of dollars for new technology that 
will have no appreciable effect on the haze in any Class I 
area.3 A similar problem arises when a state considers, as it 

__________
 3 EPA's rule requires states to consider the cost of compliance 
in terms of the likely emission reductions which would be achieved 

must, the "existing pollution control technology in use at the 
source." How is a state to decide whether the source already 
has installed sufficient devices without determining how 
much, if at all, the source is contributing to visual impairment 
in downwind Class I areas? As the industry petitioners 
correctly note, there is no point during the Haze Rule's 
BART determination "in which it could be demonstrated that 
the degree of improvement in visibility obtained from install-
ing a particular set of emissions controls at a source with 
'exceedingly low' or even merely theoretical visibility impacts 
is not justified by the cost of BART in light of those low or 
theoretical impacts." Br. for Industry Pet'rs and Intervenor 
in Case Nos. 99-1348, et al. at 17-18.

 The Haze Rule's treatment of s 169A(g)(2)'s degree-of-
improvement calculation is, the industry petitioners argue, 
not the only respect in which the rule is inconsistent with the 
Act. As they see it, the Haze Rule also unlawfully constrains 

__________
by the imposition of BART, no matter whether this reduction would 
enhance visibility in downwind national parks. See 64 Fed. Reg. at 
35,741 (explaining that the four factors, including cost, "should be 
taken into account for each source subject to BART in order to 
compare tradeoffs between the control efficiencies and costs associ-
ated with various control alternatives"). The preamble to the rule 
provides very little guidance about how states are to calculate the 
degree of improvement in visibility under the regime EPA contem-
plates. The preamble tells the states only this:

 To calculate the degree of improvement in visibility that would 
 be expected at each Class I area as a result of imposing BART 
 on all sources subject to BART, the State should estimate the 
 possible emissions reductions resulting from the application of 
 BART at all subject sources located within the region that 
 contributes to visibility impairment in the Class I area. The 
 State should work on its own or in conjunction with other 
 States, such as a regional planning body, to determine the 
 geographic scope of the region that contributes to each Class I 
 area. The States should consult with one another to determine 
 the emission reductions achievable from sources subject to 
 BART in other states.
 
Id.

the states' statutory authority because under the Act it is the 
states - not EPA - who must determine which BART-eligible 
sources should be subject to BART. See 42 U.S.C. 
s 7491(b)(2)(A) (providing that each BART-eligible source 
that, "as determined by the State ... emits any air pollutant 
which may reasonably be anticipated to cause or contribute to 
any impairment of visibility," shall install and operate the 
best available retrofit technology (italics added)); see also id. 
s 7491(g)(2) (listing the factors that "the State ... shall take 
into consideration" in determining BART controls (italics 
added)).

 We agree with these petitioners that the Haze Rule's 
BART provisions are inconsistent with the Act's provisions 
giving the states broad authority over BART determinations. 
See id. s 7491(b)(2)(A); see also id. s 7491(g)(2). The Haze 
Rule ties the states' hands and forces them to require BART 
controls at sources without any empirical evidence of the 
particular source's contribution to visibility impairment in a 
Class I area. See 64 Fed. Reg. at 35,740; see also Br. for EPA 
at 26-27. If the Haze Rule contained some kind of a mecha-
nism by which a state could exempt a BART-eligible source 
on the basis of an individualized contribution determination, 
then perhaps the plain meaning of the Act would not be 
violated. But the Haze Rule contains no such mechanism. 
Section 169A(c)(1) - on which EPA relies - is a procedure by 
which the Administrator, with the approval of federal land 
managers, can exempt a source from BART requirements. 
See 42 U.S.C. s 7491(c)(1) ("The Administrator may, by rule, 
after notice and opportunity for public hearing, exempt any 
major stationary source from [the BART requirements], upon 
his determination that such source does not or will not, by 
itself or in combination with other sources, emit any air 
pollutant which may reasonably be anticipated to cause or 
contribute to a significant impairment of visibility in any 
mandatory class I Federal area."); see also id. s 7491(c)(3). 
It does not provide the states with a means by which they can 
exempt sources based on individual contribution determina-
tions.

 Our conclusion that the Haze Rule's BART provisions 
impermissibly constrain state authority is reinforced by the 
Conference Report on the 1977 amendments to the Act. See 
Demby v. Schweiker, 671 F.2d 507, 510 (D.C. Cir. 1981). The 
Report explains:

 The agreement clarifies that the State, rather than the 
 Administrator, identifies the source that impairs visibility 
 in the Federal class I areas identified....
 
 In establishing emission limitations for any source which 
 impairs visibility, the State shall determine what consti-
 tutes "best available retrofit technology" ... in establish-
 ing emission limitations on a source-by-source basis to be 
 included in the State implementation plan so as to carry 
 out the requirements of this section.
 
H.R. Conf. Rep. No. 95-564 (1977), reprinted in 3 Senate 
Comm. on Env't and Pub. Works, A legislative History of the 
Clean Air Act Amendments of 1977, at 535 (1978) [hereinafter 
"1977 Legislative History"]. The "agreement" to which the 
Conference Report refers was an agreement to reject the 
House bill's provisions giving EPA the power to determine 
whether a source contributes to visibility impairment and, if 
so, what BART controls should be applied to that source. 
See id. at 533-35. Pursuant to the agreement, language was 
inserted to make it clear that the states - not EPA - would 
make these BART determinations. See id. at 533-35; see 
also H.R. Res. 4151, 95th Cong. (1977), reprinted in 1977 
Legislative History at 1985, 2325-30. The Conference Report 
thus confirms that Congress intended the states to decide 
which sources impair visibility and what BART controls 
should apply to those sources. The Haze Rule attempts to 
deprive the states of some of this statutory authority, in 
contravention of the Act.

 In sum, we conclude that the Haze Rule's BART provisions 
are contrary to the text, structure and history of s 169A of 
the Act because the rule isolates s 169A(g)(2)'s benefit calcu-
lation and constrains authority Congress conferred on the 
states. Although petitioners also contended that no concept 
of a group or area-wide BART determination could ever be 

consistent with the Act,4 we need not decide that broad issue 
today. We hold only that the Haze Rule's treatment of 
s 169A(g)(2)'s benefit calculation and its infringement on 
states' authority under the Act render the BART provisions 
of the rule impermissible.

 III. The "Natural Visibility" Goal and the 
 "No Degradation" Requirement

 The industry petitioners in Case Nos. 01-1111, 01-1112, and 
01-1113 ("Reconsideration Petitioners") cite four grounds in 
support of their claim that the "natural visibility" goal and the 
"no degradation" requirement in the Haze Rule should be 
vacated as "arbitrary and capricious" and otherwise not in 
accordance with law: (1) EPA exceeded its authority under 
s 169A(a)(1) and adopted regulations that conflict with the 
PSD program in establishing "natural visibility" as the goal of 
the regional haze program; (2) the regulations impermissibly 
constrain state discretion in requiring that the states develop 
their visibility programs using the "no degradation" require-
ment as a bench mark; (3) EPA has no authority to impose 
upon the states the goal of achieving "natural visibility" 
conditions, and thereby restrict the opportunity of some 
states to participate in the planning process aimed at address-
ing regional haze; and (4) EPA promulgated the Haze Rule 
without providing adequate notice and an opportunity for 
comment. We find no merit in these claims and, accordingly, 
deny industry petitioners' challenge to the "natural visibility" 
goal and the "no degradation" requirement.

__________
 4 The industry petitioners argued that source-by-source BART 
determinations are required by the statute and that no concept of 
area-wide BART determinations is permissible. See Brief for In-
dustry Pet'rs and Intervenor in Case Nos. 99-1348, et al. at 14 
(arguing that s 169A makes it clear that BART determinations 
"must be made on a source-by-source basis"). Cf. Train v. Natural 
Res. Def. Council, 421 U.S. 60, 64 (1975) (discussing the history of 
the Clean Air Act and how the premise of the Act was to give states 
and local governments responsibility over preventing air pollution 
"at its source").

 Before we turn to the merits of petitioners' claims, we must 
first address EPA's contentions that petitioners' challenge to 
the natural visibility goal and their claims of inadequate 
notice are barred because they were not properly raised 
before the agency. We find no merit in EPA's contentions. 
Petitioners argued that the Haze Rule conflicted with the 
PSD program in both their comments to the agency before 
the regulations were issued and in their petition for reconsid-
eration. See Supplemental Comments of the Utility Air 
Regulatory Group at 22, reprinted in Joint Appendix ("J.A.") 
156; Petition for Reconsideration of the Regional Haze Regu-
lations Submitted by Utility Air Regulatory Group & Nation-
al Mining Ass'n at 10-11, reprinted in J.A. 97-98. Petitioners 
also sought notice and comment in connection with these 
portions of the Haze Rule in their petition for reconsideration. 
See Petition for Reconsideration of the Regional Haze Rule 
Submitted by the Center for Energy and Economic Develop-
ment at 11-14, reprinted in J.A. 116-19.

 On the merits, we reject petitioners' claim that EPA had no 
authority under s 169A to adopt the natural visibility goal. 
EPA acted under express congressional authorization in pro-
mulgating the challenged regulations. See 42 U.S.C. 
s 7491(a)(4). In a case such as this, where

 "there is an express delegation of authority to the agency 
 to elucidate a specific provision of the statute by regula-
 tion," Chevron, 467 U.S. at 843-844, ... any ensuing 
 regulation is binding in the courts unless procedurally 
 defective, arbitrary or capricious in substance, or mani-
 festly contrary to the statute.
 
United States v. Mead Corp., 533 U.S. 218, 227 (2001) (foot-
note omitted). The natural visibility goal is neither "mani-
festly contrary to the statute" nor "arbitrary or capricious in 
substance." Indeed, the goal is an eminently reasonable 
elucidation of the statute.

 The statutory goal enunciated in s 169A(a)(1) is quite clear: 
"the prevention of any future, and the remedying of any 
existing, impairment of visibility." 42 U.S.C. s 7491(a)(1). 
Petitioners argue that a "natural visibility" goal cannot be 

gleaned from this statutory standard. This claim is specious. 
Agency regulations that aim to remedy any existing impair-
ment of visibility and prevent any future impairment - as the 
statute commands - will of necessity aim to achieve a state of 
natural visibility. There is no material inconsistency between 
the statutory and regulatory goals, for the latter merely 
elucidates the former.

 The petitioners also claim that Congress did not intend for 
the statutory goal of s 169A(a) to displace the objectives of 
the PSD program. Therefore, according to petitioners, the 
natural visibility goal and the no degradation requirement 
cannot be squared with the PSD program, because that 
program recognizes that some impairment of visibility would 
be acceptable in Mandatory Federal Class I areas. We reject 
this argument, because EPA has reasonably construed the 
PSD program and the disputed regional haze rules as comple-
mentary regulatory regimes.

 There are two things worth noting at the outset. First, the 
natural visibility goal is not a mandate, it is a goal. As EPA 
has explained, this goal serves as the foundation for analytical 
tools to be used by the states to set reasonable progress 
goals. 64 Fed. Reg. at 35,732-33 Petitioners' claim that the 
agency is without authority to mandate attainment of the 
national goal is therefore meritless.

 Second, the statute specifically calls for regulations to 
assure "reasonable progress toward meeting the national 
goal" of remedying any current and preventing any future 
impairment of visibility. 42 U.S.C. s 7491(a)(4). The no 
degradation provision requires implementation plans to "pro-
vide for an improvement in visibility for the most impaired 
days over the period of the implementation plan and ensure 
no degradation in visibility for the least impaired days over 
the same period." 40 C.F.R. s 51.308(d)(1). This regulation 
plainly and permissibly serves to assure the reasonable prog-
ress sought by Congress.

 The PSD program was adopted pursuant to the 1977 
amendments to the Act. See generally Ala. Power Co. v. 
Costle, 636 F.2d 323, 349-51 (D.C. Cir. 1979). The program 

generally controls any additional deterioration of air quality 
by establishing maximum allowable increases of certain pollu-
tants in specified areas. See 42 U.S.C. s 7473(b). It is 
therefore true, as industry petitioners point out, that the PSD 
program may sometimes allow for limited air quality deterio-
ration. EPA, however, has taken pains to explain that the 
PSD program and the Haze Rule are not at odds:

 Section 169A of the CAA requires the EPA to promul-
 gate regulations to ensure that the States revise their 
 implementation plans to contain those measures neces-
 sary to make reasonable progress toward the national 
 visibility goal. In addition to the remedying of any 
 existing visibility impairment, that goal requires the pre-
 vention of any future visibility impairment in mandatory 
 Class I Federal areas. As part of the overall strategy to 
 effectuate that goal, the final rule requires States to 
 identify all anthropogenic sources of visibility impair-
 ment. The States accordingly should take into account 
 the cumulative effect of all existing, man-made sources of 
 air pollution in developing their regional haze implemen-
 tation plan as well as potential new sources.
 
 With respect to the comment that EPA lacks authority 
 to impose a welfare-based standard which renders other 
 requirements of the CAA such a[s] PSD and NSPS 
 largely superfluous, EPA notes that when Congress 
 amended the CAA in 1977 to provide for the protection of 
 visibility, it was aware of both the PSD and NSPS 
 provisions. Nevertheless, Congress required EPA to 
 issue regulations to address visibility. In contrast, the 
 final regional haze rule requires States to take into 
 account the visibility impact of emissions from both 
 existing and new sources, and stationary and nonstation-
 ary sources. This is only one of many instances under 
 the CAA in which Congress has provided for overlapping 
 regulation. Indeed, the PSD and NSPS programs both 
 focus on the control of emissions from new stationary 
 sources. EPA believes that the regional haze rule and 
 these other provisions are complementary means of im-
 proving air quality.
 
 Commenters raised a number of specific questions 
 regarding the interaction of the PSD program and the 
 regional haze rule. One commenter asked the EPA to 
 address the relationship of allowable Class I impacts to 
 the proposed visibility impact limits. All PSD areas are 
 categorized as Class I, II, or III. The classification of an 
 area determines the corresponding maximum allowable 
 increases, or increment, of air quality deterioration. 
 Only a relatively small increment of air quality deteriora-
 tion is permissible in Class I areas. These increments 
 are measured over annual, 24-hour, and/or 3-hour aver-
 aging times. Nowhere, however, does the CAA provide 
 that air quality must be allowed to deteriorate to the full 
 extent allowed by the Class I increments standing alone. 
 To read the statute in that manner would contravene 
 both the general goals of the CAA to "protect and 
 enhance" air quality (see section 101(b)(1)) but the specif-
 ic long-term goal of section 169A is to eventually remedy 
 existing visibility impairment in Class I areas. Accord-
 ingly, we believe that allowing localized air quality in-
 creases in the short-term due to the emissions from 
 major new sources subject to PSD is not inconsistent 
 with the regional haze program. The regional haze 
 program is focused on long-term emission decreases from 
 the entire regional emission inventory, comprised of ma-
 jor and minor stationary sources, area sources and mo-
 bile sources. We expect that long-term emission strate-
 gies for regional haze will derive substantial emission 
 decreases from the inventory as a whole, and that these 
 overall strategies will be able to accommodate some 
 localized increases within the framework of a regional 
 decrease. We also note that the overall inventory would 
 decrease in cases where new sources are built that 
 replace older, more polluting sources. Accordingly, we 
 do not see any inherent conflict between the two pro-
 grams.
 
 While the PSD program generally allows for a small 
 increment of air quality deterioration in Class I areas, 
 section 165 of the CAA also provides for the additional 
 
 protection of air quality-related values, "including visibili-
 ty," in Class I Federal areas beyond that provided by the 
 increments. That is, where the FLM [Federal Land 
 Manager] demonstrates that emissions from a new or 
 modified source will have an adverse impact on air 
 quality-related values (AQRVs), notwithstanding the fact 
 that the emissions from the source do not cause or 
 contribute to concentrations in excess of the increment 
 for a Class I area, "a permit shall not be issued." 
 Section 165(d). Thus, under PSD there can be no in-
 crease in emissions from the construction or modification 
 of a major stationary source where that increase would 
 result in adverse impacts on AQRVs in a Class I Federal 
 area.
 
Responses to Significant Comments on the Notice of Pro-
posed Rulemaking s I.F (Apr. 1999), reprinted in J.A. 1062-
63.

 The Government also reminds us that the PSD program 
"does not require that [visibility] deterioration occur. Nor 
does it create an entitlement to degrade air quality in general 
or visibility in particular, because nothing in the CAA pro-
vides for issuance of a PSD permit as a matter of right." Br. 
for EPA at 59. We agree.

 Petitioners cite Alabama Power in an attempt to support 
their claim that the existence of the PSD program effectively 
bars "natural visibility" as a viable regulatory goal. Alabama 
Power supports no such claim. Indeed, the court noted that 
"[s]ection 169A is available to protect visibility in Class I 
areas where visibility is an important characteristic, and the 
[agency] may choose to invoke [its] rulemaking authority ... 
to address this problem." 636 F.2d at 368. In acknowl-
edging the availability of s 169A, the court implicitly em-
braced EPA's view that the visibility program is a supplement 
to the PSD program.

 Industry petitioners additionally claim that the no degrada-
tion requirement conflicts with s 169A(g)(1)'s list of factors 
that states must consider when determining reasonable prog-
ress. Section 169A(g)(1) states:

 in determining reasonable progress there shall be taken 
 into consideration the costs of compliance, the time nec-
 essary for compliance, and the energy and nonair quality 
 environmental impacts of compliance, and the remaining 
 useful life of any existing source subject to such require-
 ments.
 
42 U.S.C. s 7491(g)(1). Petitioners argue that, because "rea-
sonable progress" could at times involve degradation, the "no 
degradation" requirement restricts the States' authority to 
apply the statutory criteria. We disagree.

 As noted above, the statute commands EPA to promulgate 
regulations assuring "reasonable progress toward meeting 
the national goal." Id. s 7491(a)(4). The national goal in-
cludes "the prevention of any future ... impairment of 
visibility." Id. s 7491(a)(1). The no degradation require-
ment simply elucidates "reasonable progress." The require-
ment does not, however, in any way alter the list of 
s 169A(g)(1) criteria. In fact, the cited statutory factors do 
not include "degradation." Therefore, the States will be able 
to comply with the no degradation requirement while apply-
ing the s 169A(g)(1) criteria.

 Next, although the petitioners assert that the Haze Rule 
somehow restricts the opportunity of some states to partici-
pate in the planning process aimed at addressing regional 
haze, we can find no real evidence in support of this claim. 
This contention certainly offers no ground upon which to 
vacate the disputed regulations.

 Finally, petitioners claim that they did not have fair notice 
and an adequate opportunity to comment on the regulatory 
goal of natural visibility, because "EPA provided no notice in 
its 1997 proposal that it intended to require States to achieve 
natural visibility conditions." Br. for Reconsideration Pet'rs 
at 25. Rather, according to petitioners, EPA merely pro-
posed regulations patterned on the statutory goal enunciated 
in s 169A(a)(1), i.e., "'preventing any future, and remedying 
any existing, impairment of visibility."' Br. for Reconsidera-
tion Pet'rs at 25 (quoting old 40 C.F.R. s 51.300(a)(1)). This 
argument is meritless. As noted above, there is no material 

inconsistency between the statutory goal enunciated in 
s 169A(a)(1) and the regulatory goal of "natural visibility." 
The latter is a "logical outgrowth" of the former. Fertilizer 
Inst. v. EPA, 935 F.2d 1303, 1311 (D.C. Cir. 1991). There-
fore, EPA did not violate any notice and comment require-
ments in adopting the natural visibility goal as a part of the 
Haze Rule.

 If there is any tension between the Haze Rule and the PSD 
program, it is EPA's responsibility to harmonize the regulato-
ry requirements. It has done so in a perfectly reasonable 
fashion. EPA's regulatory harmonization is both consistent 
with the statute and reasonable. Accordingly, we deny the 
petitions for review of the natural visibility goal and the no 
degradation requirement.

 IV. The "Reasonable Progress" Criteria and 
 the Extension of the Statutory Deadline

 While the Industry Petitioners attack the Regional Haze 
Rule as overstepping EPA's statutory authority, Sierra Club 
argues that EPA has not gone far enough to meet its 
statutory responsibilities.

 In its first cluster of attacks on the Haze Rule, Sierra Club 
contends that the Rule does not satisfy EPA's responsibility 
under CAA s 169A(a)(4) to "promulgate regulations to assure 
... reasonable progress toward meeting the national [visibili-
ty] goal," 42 U.S.C. s 7491(a)(4), its responsibility under CAA 
s 169B(e)(1) to establish "criteria for measuring 'reasonable 
progress' toward the national goal," 42 U.S.C. s 7492(e)(1), 
and its obligation under the Administrative Procedure Act not 
to act in an "arbitrary or capricious" fashion, 5 U.S.C. s 706 
(2)(A). Sierra Club argues that the Haze Rule's require-
ments for improvement in visibility during the 20 percent 
most impaired days and for no degradation during the 20 
percent least impaired days, 40 C.F.R. s 51.308(d)(1); see 
also 64 Fed. Reg. at 35,734, do not qualify as "reasonable 
progress" criteria and are arbitrary and capricious. Similar-
ly, it argues that the Rule's requirement that a state not 
adopt a rate of improvement that would take more than 60 
years to achieve natural visibility unless the state demon-

strates that the 60-year rate is unreasonable, 40 C.F.R. 
s 51.308(d)(1)(i)(b), (ii), does not meet the statutory mandates 
and lacks "requisite specificity" because a state would be 
"free to reject the 60 year time frame merely by claiming that 
such a schedule is not 'reasonable."' Reply Br. for Sierra 
Club at 5, 8.

 We might well consider the latter attack unripe even 
without reference to our decision in Part II that the group-
BART provisions of the Haze Rule are invalid. If in the 
future a state does conclude that it needs more than 60 years 
to achieve natural visibility, and if EPA decides to accept that 
conclusion, it will at that time be open to Sierra Club to 
challenge EPA's decision as arbitrary and capricious. In the 
meantime, this court will certainly "'benefit from postponing 
review until the policy in question has sufficiently crystal-
lized."' Grand Canyon Air Tour Coalition v. FAA, 154 F.3d 
455, 472 (D.C. Cir. 1998) (quoting Florida Power & Light Co. 
v. EPA, 145 F.3d 1414, 1421 (D.C. Cir. 1998)).

 But in any event, our decision to invalidate the group-
BART provisions renders this entire cluster of challenges 
unripe for disposition. Because those provisions were inti-
mately related to EPA's assessment of what was necessary to 
achieve the goal of natural visibility, we cannot be sure 
whether on remand EPA will retain its current criteria for 
evaluating reasonable progress or adopt others. If the invali-
dation of the group-BART provisions causes EPA to doubt 
the efficacy of the remaining elements of the Haze Rule, 
perhaps EPA will see wisdom in some of Sierra Club's 
complaints and, for example, increase the percentage of days 
during which there must be improvement in visibility, or 
increase the specificity of its criteria for reasonable progress. 
In light of the uncertainty that our decision creates with 
respect to the form of the rule that may emerge upon 
remand, the only prudent course is for us to decline to 
address Sierra Club's challenges at this juncture.

 Sierra Club's second major attack on the Haze Rule chal-
lenges EPA's determination to give states 3 years to file haze 
SIPs for areas designated "attainment" or "unclassifiable." 
We are troubled by EPA's action, which appears to contra-

vene express statutory language, but in light of our decision 
regarding group-BART we leave this to EPA to reconsider on 
remand as well.

 The Transportation Equity Act for the 21st Century, Pub. 
L. No. 105-178, 112 Stat. 107, 463 (1998) ("TEA-21"), provides 
that, for areas designated as "nonattainment" for the new 
national ambient air quality standard (NAAQS) for fine par-
ticulate matter, EPA shall require states to submit haze SIPs 
3 years after the area has been so designated. See TEA-21 
s 6102(c)(2) (incorporating the 3-year deadline of 42 U.S.C. 
s 7492(e)(2)). However, TEA-21 also expressly mandates 
that for any area designated as "attainment" or "unclassifia-
ble" for that standard, EPA "shall require the [SIP] to be 
submitted 1 year after the area has been so designated." Id. 
Nonetheless, the Haze Rule permits a state to "choose to 
defer addressing the [Rule's] core requirements for regional 
haze ... and the requirements for BART" by submitting a 
so-called "commitment SIP," containing a "demonstration of 
ongoing participation in a regional planning process to ad-
dress regional haze, and an agreement ... to continue partic-
ipating," a "description of the regional planning process," and 
a "list of all BART-eligible sources within the state." 40 
C.F.R. s 51.308(c), (c)(1). If a state submits such a commit-
ment SIP, the deadline for submitting a haze SIP is extended 
from 1 year to 3. Id. s 51.308(c)(2); see Br. for EPA at 87; 
Br. for Sierra Club at 25.

 On its face, this provision of the Haze Rule appears to 
extend the express statutory deadline for "attainment" and 
"unclassifiable" areas, an action which is beyond the agency's 
authority. See Sierra Club v. EPA, 129 F.3d 137, 140 (D.C. 
Cir. 1997) (holding that EPA cannot establish a "grace peri-
od" for compliance when not authorized to do so by the CAA); 
Sierra Club v. EPA, 719 F.2d 436, 469 (D.C. Cir. 1983) 
(reversing an EPA implementation plan that would have 
effectively extended the statutory deadline for state submis-
sions under CAA amendments). The statute requires states 
to submit, by the 1-year deadline, SIPs "contain[ing] such 
emission limits, schedules of compliance, and other measures 
as may be necessary to carry out" the haze regulations. 42 

U.S.C. s 7492(e)(2) (incorporated by reference into TEA-21 
s 6102(c)(2)). A commitment SIP, which by definition ad-
dresses neither the Haze Rule's "core requirements for re-
gional haze," nor its "requirements for BART," 40 C.F.R. 
s 51.308(c), does not appear to satisfy the statutory require-
ment. Cf. Natural Res. Def. Council, Inc. v. EPA, 22 F.3d 
1125, 1134 (D.C. Cir. 1994) (holding, under CAA s 110(k)(4), 
that EPA cannot satisfy its responsibility to determine wheth-
er a state plan submission complies with the CAA unless the 
submission "contains something more than a mere promise to 
take appropriate but unidentified measures in the future," 
and that a submission containing nothing more than such a 
commitment cannot extend the statutory deadline).

 Notwithstanding our doubts about the validity of this provi-
sion, we decline to vacate it in light of the uncertainty that 
our decision invalidating the group-BART provisions of the 
Haze Rule will cast upon the contents of the SIPs required of 
the states. With the Rule and hence the contents of the SIPs 
now altered and subject to revision on remand, the more 
prudent course for this court is simply to remand the dead-
line-extension issue as well. This will permit the agency to 
reconsider its decision to extend the deadline at the same 
time that it decides what form the substantive requirements 
of a revised Haze Rule should take.

 Garland, Circuit Judge, concurring in part and dissenting 
in part: In the Clean Air Act, Congress declared a national 
goal of restoring natural visibility in the country's largest 
national parks and wilderness areas. In Part II of today's 
opinion, the court adopts an interpretation of the Act that, in 
the view of the Environmental Protection Agency (EPA) and 
the National Academy of Sciences, will prevent the achieve-
ment of Congress' goal. If that interpretation were required 
by the statutory language, we would of course be compelled 
to adopt it. But such an interpretation is not required. To 
the contrary, EPA's construction of the Clean Air Act as 
permitting the group-BART provisions of the Haze Rule is a 
reasonable interpretation of the legislative language. It is 
therefore entitled to our deference under the standard an-
nounced in Chevron U.S.A. Inc. v. Natural Res. Def. Council, 
Inc., 467 U.S. 837, 842-43 (1984). Accordingly, while concur-
ring in most of the court's opinion, I dissent from the 
conclusions it reaches in Part II.

 A

 Chevron instructs courts to apply a two-step framework 
when reviewing an agency's construction of a statute. First, 
we must ask "whether Congress has directly spoken to the 
precise question at issue," in which case we "must give effect 
to the unambiguously expressed intent of Congress." Id. at 
842-43. However, if the "statute is silent or ambiguous with 
respect to the specific issue," we move to the second step and 
must defer to the agency's interpretation as long as it is 
"based on a permissible construction of the statute." Id. at 
843; accord Barnhart v. Walton, 122 S.Ct. 1265, 1271-72 
(2002).

 My colleagues stop at Chevron's first step, concluding that 
the language of the Clean Air Act (CAA) can be read in only 
one way. They adopt the view of the industry petitioners 
that under the Act, BART ("best available retrofit technolo-
gy") controls cannot be imposed on a source unless a state 
determines how much that particular source contributes to 
visual impairment in a downwind national park or wilderness 
area, as well as how much improvement in visibility would 
result from installing BART controls at that specific source. 
Op. at 10-11. EPA, by contrast, interprets the Clean Air Act 

as permitting a collective assessment of the impact that 
emissions from (and controls on) sources located in upwind 
regions have on visibility impairment in downwind areas.

 Before considering the grounds for the court's decision, it is 
important to understand why EPA decided to require a 
collective contribution approach, rather than a tracing of the 
effects of each individual source's emissions. Congress added 
s 169A to the Clean Air Act "[i]n response to a growing 
awareness that visibility was rapidly deteriorating" in major 
national parks and wilderness areas ("Class I areas"). Chev-
ron U.S.A., Inc. v. EPA, 658 F.2d 271, 272 (5th Cir. 1981). 
The section establishes a national goal of restoring natural 
visibility in such areas,1 and expressly instructs EPA to issue 
regulations to "assure ... reasonable progress" toward meet-
ing the national goal. 42 U.S.C. s 7491(a)(4). After examin-
ing the results of scientific studies, EPA concluded that such 
reasonable progress was not possible without a collective 
approach. The record compiled by EPA showed that visibili-
ty impairment in Class I areas is caused in large part by 
long-range transport of combined emissions from multiple 
sources.2 Although it is practicable to trace emissions from 
an individual source into its surrounding region, and to model 
the transport of combined pollution from that region to a 
downwind Class I area,3 it is not possible to trace emissions 

__________
 1 Section 169A declares the national goal to be "the prevention 
of any future, and the remedying of any existing, impairment of 
visibility in mandatory class I Federal areas." 42 U.S.C. 
s 7491(a)(1). As the court holds today, agency regulations that aim 
to accomplish these objectives "will of necessity aim to achieve a 
state of natural visibility." Op. at 16.

 2 See, e.g., Congressional Research Service, Regional Haze: 
EPA's Proposal to Improve Visibility in National Parks and 
Wilderness Areas 2 (1997) (J.A. at 242); National Academy of 
Sciences, National Research Council, Protecting Visibility in 
National Parks and Wilderness Areas 7-8, 196-99 (1993) (J.A. at 
362, 456-57) [hereinafter "NAS Report"].

 3 See Regional Haze Regulations, 64 Fed. Reg. 35,714, 35,718 
(July 1, 1999). The court does not dispute the reasonableness of, or 

from an individual source directly to such a downwind area 
without great time and expense4--and even then the results 
would be of uncertain reliability.5 Citing the National Acade-
my of Sciences' conclusion that a program focused "on deter-
mining the contribution of individual emission sources to 
visibility impairment is doomed to failure,"6 EPA adopted the 
group-BART approach that is at issue here.

__________
support for, the latter proposition. Cf. Appalachian Power Co. v. 
EPA, 135 F.3d 791, 802 (D.C. Cir. 1998) (noting that "computer 
models are a useful and often essential tool for performing the 
Herculean labors Congress imposed on EPA in the Clean Air Act," 
and that "their scientific nature does not easily lend itself to judicial 
review" (internal quotation marks omitted)); id. at 814 ("[O]ur 
consideration of EPA's use of computer models proceeds with 
considerable deference to the agency's expertise.").

 4 See NAS Report at 240-41 (J.A. at 478) ("It would be ex-
tremely time-consuming and expensive to try to determine the 
percent contribution of individual sources to haze one source at a 
time."); Regional Haze Regulations, 64 Fed. Reg. at 35,740 ("[E]s-
tablishing the contribution from one particular source to the prob-
lem of regional haze would require lengthy and expensive studies 
and pose substantial technical difficulties.").

 5 See NAS Report at 2 (J.A. at 359) ("During transport, the 
emissions from many sources mix together to form a uniform, 
widespread haze known as regional haze."); id. at 20 (J.A. at 368) 
("[T]he extent to which [source-specific] techniques can be used in 
attributing visibility impairment is uncertain, as is their usefulness 
in estimating the effect that different control strategies might have 
on visibility."); id. at 25-26 (J.A. at 370-71) ("Efforts to decide 
whether a particular source is contributing to regional haze have 
thus far encountered grave obstacles. Studies designed to estimate 
the effect of a particular source on surrounding visibility are 
expensive, and the results can be uncertain and controversial."). To 
take just one example, "the efforts to trace the contribution of the 
Navajo Generating Station to haze in the Grand Canyon National 
Park took several years and cost millions of dollars without leading 
to quantitatively definitive answers." Id. at 7 (J.A. at 361).

 6 EPA, Resp. to Pets. for Recons. of Regional Haze Rule 16 
(Jan. 10, 2001) (J.A. at 17) (quoting NAS Report at 7 (J.A. at 361)); 

 My colleagues do not dispute that we must defer to EPA's 
expert opinion regarding the impracticability of tracing indi-
vidual source emissions.7 Rather, they conclude that notwith-
standing EPA's view of the facts, the industry petitioners are 
correct that the Haze Rule's group-BART provisions violate 
the plain meaning of the Clean Air Act by: (i) employing a 
group rather than source-by-source standard in determining 
the appropriate BART controls for a particular source, and 
(ii) constraining the authority of the states to make their own 
BART-related decisions. These two contentions are consid-
ered in Parts B and C below. Because I conclude that there 
is nothing in the Clean Air Act that bars the approach taken 
by EPA, and that to the contrary the Haze Rule rests on a 
reasonable interpretation of the statutory language, I would 
follow the Supreme Court's direction in Chevron and uphold 
the Rule.

 B

 As the court notes, the Haze Rule employs a group analysis 
in making two determinations required by the Clean Air Act: 
(i) whether a pollution-emitting source is subject to BART 
requirements at all, and (ii) what kind of BART controls 
should be placed on a subject source. The industry petition-
ers contend that the Clean Air Act prohibits the use of a 
group standard in making either of these determinations.

 Under the Act, a source is subject to BART requirements, 
and hence a state implementation plan must require such a 
source to install BART controls, if it "emits any air pollutant 
which may reasonably be anticipated to cause or contribute to 
any impairment of visibility in any [Class I] area." CAA 

__________

see also NAS Report at 240 (J.A. at 478) ("The committee doubts 
... that such attributions could be the basis for a workable visibility 
protection program.").

 7 See Appalachian Power, 135 F.3d at 801-02 ("Our analysis is 
guided by the deference traditionally given to agency expertise, 
particularly when dealing with a statutory scheme as unwieldy and 
science-driven as the Clean Air Act."); see also Husqvarna AB v. 
EPA, 254 F.3d 195, 199 (D.C. Cir. 2001).

s 169A(b)(2)(A), 42 U.S.C. s 7491(b)(2)(A). Under the Haze 
Rule, a state must "find that a BART-eligible source is 
'reasonably anticipated to cause or contribute' to regional 
haze if it can be shown that the source emits pollutants within 
a geographic area from which pollutants can be emitted and 
transported downwind to a Class I area." Regional Haze 
Regulations, 64 Fed. Reg. at 35,740. That is, a source is 
subject to BART requirements, without proof of that source's 
individual contribution to visibility impairment in a Class I 
area, as long as the source emits pollutants into an upwind 
area from which pollutants may be transported to a down-
wind Class I area. Id.

 The industry petitioners contend that CAA s 169A(b)(2) 
unambiguously provides that a source is subject to BART 
requirements only if a state can show the extent to which that 
particular source contributes to impairment in a Class I area. 
That section, however, requires states to impose BART con-
trols on any source that "emits any air pollutant which may 
reasonably be anticipated to cause or contribute to any 
impairment of visibility in any [Class I] area." 42 U.S.C. 
s 7491(b)(2)(A) (emphasis added). Far from plainly compel-
ling the petitioners' reading, the italicized words pile ambigui-
ty upon ambiguity and virtually invite the reader to adopt the 
construction favored by EPA. See Merriam-Webster's Col-
legiate Dictionary 252 (10th ed. 1996) (defining "contribute" 
as "to give or supply in common with others," or "to give a 
part to a common ... store") (emphasis added); Central 
Ariz. Water Conservation Dist., 990 F.2d 1531, 1541 (9th Cir. 
1993) ("The phrase 'may reasonably be anticipated' suggests 
that Congress did not intend to require EPA to show a 
precise relationship between a source's emissions and all or a 
specific fraction of the visibility impairment within a Class I 
area." (quoting with approval National Research Council, 
Haze in the Grand Canyon: An Evaluation of the Winter 
Haze Intensive Tracer Experiment 5 (1990))). If a source is 
one of several that emit pollutants into an upwind area, and if 
pollution from that area is transported downwind to a nation-

al park,8 then it can hardly be unreasonable to conclude that 
the pollutants issued by the source "may reasonably be 
anticipated" to "contribute" to "any" impairment in the park.

 My colleagues wisely do not accept the industry petitioners' 
contention that s 169A(b)(2) bars a collective determination 
of whether a source is subject to BART. (As discussed in 
Part C infra, they do conclude that EPA may not require the 
states to employ such a mode of analysis.) They do, however, 
accept the petitioners' contention that to determine the kind 
of BART controls that should be imposed on a subject source, 
a state must determine how much that particular source 
contributes to visual impairment in the downwind Class I 
area, Op. at 11, as well as the degree of improvement in 
visibility that would occur in the downwind area if that 
particular source installed such controls, id. at 10. The Haze 
Rule, by contrast, provides that once a state has concluded 
that a particular source is subject to BART requirements, in 
determining the kind of BART controls to place on the source 
the state must consider the degree of improvement that 
would be achieved in the downwind area by imposing BART 
controls on all subject sources in the contributing upwind 
area. See 40 C.F.R. s 51.308(e)(1)(ii)(B); Regional Haze 
Regulations, 64 Fed. Reg. at 35,741.

 The industry petitioners rest their contention that the 
statute unambiguously bars this collective assessment ap-
proach on s 169A(g)(2), which states:

 [I]n determining best available retrofit technology the 
 State ... shall take into consideration [1] the costs of 
 compliance, [2] the energy and nonair quality environ-
 mental impacts of compliance, [3] any existing pollution 
 control technology in use at the source, [4] the remaining 
 useful life of the source, and [5] the degree of improve-
 
__________
 8 Under the Haze Rule, the state must establish the first 
condition directly and the second through the application of comput-
er modeling techniques. See Regional Haze Regulations, 64 Fed. 
Reg. at 35,740, 35,741; supra note 3.

 ment in visibility which may reasonably be anticipated to 
 result from the use of such technology.
 
42 U.S.C. s 7491(g)(2). According to both the industry peti-
tioners and the court, this section requires the state to take 
into consideration each of the five listed factors on a source-
by-source basis. Since the Haze Rule does require source-
by-source consideration of the first four factors, see Regional 
Haze Regulations, 64 Fed. Reg. at 35,740-41; Op. at 9, the 
only question is whether such consideration is also required of 
the fifth factor: "the degree of improvement in visibility 
which may reasonably be anticipated to result from the use of 
such technology."

 There is nothing in the statutory language that requires a 
source-by-source application of the fifth factor. Section 
169A(g)(2) requires an assessment of the degree of improve-
ment that may reasonably be anticipated "from the use of 
such technology," but it does not say whether that improve-
ment must be from the use of such technology by a single 
source or by all sources in the upwind area.9 Although the 
court says that the statute does not permit any of the five 
factors to be treated differently from any of the others, the 
statute itself does not say so. Moreover, the first four factors 
are different in kind from the fifth: the first four all go to the 
cost of imposing controls on a particular source and permit a 
determination of the most cost-effective control technology 
for each such source. Regional Haze Regulations, 64 Fed. 
Reg. at 35,740-41. The fifth factor, by contrast, goes to the 
benefit to be derived from using the most cost-effective 
controls. In EPA's expert view, that benefit can best be 
determined by considering the total benefit that would accrue 
if each source in the upwind area used the kind of controls 
most cost-effective for that source.

 The industry petitioners concede that s 169A(g)(2) does not 
require a state to undertake a cost-benefit analysis in decid-
ing the type of controls to impose, or specify the weight to be 

__________
 9 See Regional Haze Regulations, 64 Fed. Reg. at 35,741 ("EPA 
interprets the language 'from the use of such technology' to refer to 
the application of BART level controls to all sources subject to 
BART.").

accorded to any of the five factors.10 All that is required is 
that the state "take into consideration" the five listed factors. 
42 U.S.C. s 7491(g)(2). Because the statute does not specify 
how the state should take those factors into consideration, it 
does not bar EPA from employing a group rather than 
source-by-source mode of analysis in considering benefits. 
See Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1045 (D.C. 
Cir. 1978) (holding that where "Congress did not mandate any 
particular structure or weight" for the factors EPA is to 
consider, "it left EPA with discretion to decide how to account 
for the consideration factors, and how much weight to give 
each factor"); see also New York v. Reilly, 969 F.2d 1147, 
1150 (D.C. Cir. 1992) (same).

 Other related provisions of the Clean Air Act support 
EPA's reading of s 169A(g)(2) as permitting a region-wide 
assessment. Section 169A(a)(3) directs EPA to undertake a 
study to "identify the classes or categories of sources ... 
which, alone or in conjunction with other sources ..., may 
reasonably be anticipated to cause or contribute significantly 
to impairment of visibility," 42 U.S.C. s 7491(a)(3) (emphasis 
added), and s 169A(b)(1) directs that the regulations promul-
gated under s 169A take into account the recommendations 
of that study, 42 U.S.C. s 7491(b)(1). Similarly, s 169B(a)(1) 
instructs EPA to conduct research "to identify and evaluate 
sources and source regions of ... visibility impairment." 42 
U.S.C. s 7492(a)(1) (emphasis added); see id. s 7492(a)(2). 
These provisions not only permit, but again appear to invite a 
group-BART approach.

 The court states that "under EPA's take on the statute, it 
is ... entirely possible that a source may be forced to spend 

__________
 10 Reply Br. for Industry Pet'rs at 8 ("Industry Petitioners 
agree ... that states are free to determine the weight and signifi-
cance to be assigned to each of the CAA s 169A(g)(2) factors."); see 
Op. at 10; cf. American Textile Mfrs. Inst., Inc. v. Donovan, 452 
U.S. 490, 510 (1981) ("When Congress has intended that an agency 
engage in cost-benefit analysis, it has clearly indicated such intent 
on the face of the statute."); Central Ariz., 990 F.2d at 1542 n.10 
(holding that "Congress has not required 'cost-benefit' analysis in 
the [Clean Air] Act").

millions of dollars for new technology that will have no 
appreciable effect on the haze in any Class I area." Op. at 
10. In accordance with the statute, however, EPA has struc-
tured the Haze Rule to avoid this result. The Rule creates 
an evidentiary presumption that, if a source emits pollution 
into an upwind region from which it can be shown that 
pollution is transported downwind to a Class I area, then it 
"may reasonably be anticipated" that the source "cause[s] or 
contribute[s] to" impairment in the Class I area--and hence 
that limiting the source's emissions will reduce that impair-
ment.11 But the presumption is not irrebuttable. To the 
contrary, the Haze Rule incorporates the exemption provision 
of s 169A(c)(1), which permits EPA to

 exempt any major stationary source from the [BART] 
 requirement of subsection (b)(2)(A) of this section, upon 
 his determination that such source does not or will not, 
 by itself or in combination with other sources, emit any 
 air pollutant which may reasonably be anticipated to 
 cause or contribute to a significant impairment of visibili-
 ty in any mandatory class I Federal area.
 
__________
 11 The court does not dispute the reasonableness of this pre-
sumption. See American Iron & Steel Inst. v. EPA, 115 F.3d 979, 
1000 (D.C. Cir. 1997) (holding that it is reasonable for EPA to 
presume that if a pollutant is present in fish tissue at a level 
exceeding that set by regulation, then any facility "that contributes 
a pollutant to a body of water [in which the fish swims] ... has the 
reasonable potential to contribute to that exceedence"); see also 
Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 
U.S. 87, 103 (1983) (holding that a reviewing court must be "at its 
most deferential" when the agency is "making predictions, within its 
area of special expertise, at the frontiers of science"); American 
Trucking Ass'ns, Inc. v. EPA, 175 F.3d 1027, 1055 (D.C. Cir. 1999) 
("[W]e have expressly held that EPA's decision to adopt and set air 
quality standards need only be based on reasonable extrapolations 
from some reliable evidence." (internal quotation marks omitted)), 
rev'd on other grounds sub nom. Whitman v. American Trucking 
Ass'ns, Inc., 531 U.S. 457 (2001).

42 U.S.C. s 7491(c)(1); see also 40 C.F.R. ss 51.303, 
.308(e)(4). Hence, a source that emits pollution into a source 
region, but that can show that BART controls are unneces-
sary because its pollution does not contribute to a significant 
impairment of visibility in a Class I area, will not have to 
spend money installing BART controls.12 All that the Haze 
Rule does is put the burden of proof on the polluter, rather 
than on the state. Moreover, the statute's limitation of the 
exemption to a source that does not by itself "or in combina-
tion with other sources" contribute to a significant impair-
ment, 42 U.S.C. s 7491(c)(1), once again invites the collective-
assessment approach taken by EPA.

 Finally, one more provision of s 169A deserves repeat 
mention here. As discussed in Part A above, s 169A(a)(4) 
instructs EPA "to promulgate regulations to assure reason-
able progress toward meeting the national goal" of restoring 
natural visibility conditions. 42 U.S.C. s 7491(a)(4). Yet 
EPA's findings indicate that it will not be possible "to assure 
reasonable progress" if the statutory interpretation an-
nounced today prevails: it is simply not practicable to deter-
mine, as the court's interpretation requires, how much a 
particular "source is contributing to visual impairment in 
downwind Class I areas," or the degree of improvement in 
visibility in such areas "that would result from [a particular] 
source's installing and operating" BART controls. Op. at 11, 
10; see supra notes 4, 5. Indeed, EPA explained that it 
"avoided inclusion of any approach in the regional haze rule 
that required the assessment of the visibility improvement 
attributed to an individual source because" the National 
Academy of Sciences had determined that such an approach 
was "doomed to failure." Resp. to Pets. for Recons. of 

__________
 12 The court correctly notes that under this exemption, it is 
EPA rather than the state that determines whether a source has 
made the required showing. EPA, however, does not rely on the 
exemption to answer the state-authority issue discussed in Part C 
below, but rather to counter the petitioners' claim that the Haze 
Rule fails to provide a source with the opportunity to demonstrate 
that it makes no appreciable contribution to visibility impairment in 
a Class I area. Br. for EPA at 29-30, 32.

Regional Haze Rule 16 (Jan. 10, 2001) (J.A. at 17) (quoting 
National Academy of Sciences, National Research Council, 
Protecting Visibility in National Parks and Wilderness 
Areas 7-8, 196-99 (1993) (J.A. at 362, 456-57)). We should 
not lightly assume that Congress enacted a statute that 
makes it impracticable to achieve the same statute's stated 
goal. There certainly is nothing in the language of the Clean 
Air Act that requires us to adopt such a self-defeating 
construction.

 C

 The industry petitioners' second attack on the Haze Rule 
marches under the banner of states' rights, but in this case 
that banner is a false flag. The Rule gives states great 
leeway to make the BART determinations required by the 
Clean Air Act, reserving to EPA no more authority than 
Congress conferred upon the agency. Moreover, as discussed 
above, the industry petitioners' insistence that both EPA and 
the states are barred from using group-BART principles will 
impose an enormous unfunded mandate on the states--re-
quiring them to engage in lengthy, expensive, and likely 
fruitless studies to trace pollutants from specific sources into 
specific Class I areas.13 It is not surprising, therefore, that 
only a single state has enlisted under the petitioner's banner. 
Five others have filed briefs in support of EPA, while the 
balance remain silent.

 The industry petitioners attack, as unlawfully constraining 
state authority, both the provision of the Haze Rule that 
concerns which sources are subject to BART requirements, 
and the provision that concerns the kind of BART controls 
that must be installed on subject sources. With respect to 
the former, the petitioners emphasize s 169A's declaration 
that "each major stationary source ... which, as determined 
by the State ... emits any air pollution which may reasonably 

__________
 13 See supra notes 4, 5; Br. for Maine, et al. at 10 (protesting 
that to adopt the industry petitioners' interpretation of s 169A(g)(2) 
"would impose staggering and costly administrative burdens" on the 
states).

be anticipated to cause or contribute to any impairment of 
visibility" in a Class I area, is subject to BART requirements. 
42 U.S.C. s 7491(b)(2)(A) (emphasis added). With respect to 
the latter, they stress that s 169A requires that each subject 
source install "the best retrofit technology, as determined by 
the State," 42 U.S.C. s 7491(b)(2)(A), and that "in determin-
ing best available retrofit technology the State ... shall take 
into consideration" the five factors discussed in Part B above, 
id. s 7491(g)(2) (emphasis added). By directing the states to 
employ a group-BART analysis in making these determina-
tions, the industry petitioners contend, and the court agrees, 
that EPA has unlawfully constrained the states' decisionmak-
ing authority. Op. at 11-13.

 The Haze Rule, however, does not contravene the statutory 
commands italicized above. Under the Rule, it is the state 
and not EPA that determines which specific sources emit 
pollution that "may reasonably be anticipated to cause or 
contribute to" impairment, and hence are subject to BART 
requirements. All that EPA has done, as explained in Part 
B, is reasonably interpret that phrase to include sources that 
emit pollution into upwind regions from which pollution is 
transported to national parks. It is still the state that must 
determine both that the source emits covered pollutants, and 
that the region into which the source emits such pollutants is 
one from which emissions may reasonably be anticipated to 
be transported to downwind parks. See 40 C.F.R. 
s 51.308(e)(1)(ii); Regional Haze Regulations, 64 Fed. Reg. at 
35,739-41; Br. for EPA at 43. Similarly, it is still the state 
that must take into consideration the five statutory factors 
and the state that must then determine the best available 
retrofit technology for a particular source. All that EPA has 
done, again as explained in Part B, is reasonably interpret the 
fifth of those factors to require the state to analyze the 
degree of anticipated improvement on a group basis. See 
Regional Haze Regulations, 64 Fed. Reg. at 35,741.

 Moreover, the Clean Air Act expressly delegates to EPA 
the authority to make these kinds of judgments. As already 
noted, s 169A directs EPA to promulgate regulations to 

assure reasonable progress toward meeting the national goal 
of restoring natural visibility. 42 U.S.C. s 7491(a)(4). It 
further instructs that those regulations shall "provide guide-
lines to the States ... on appropriate techniques and meth-
ods for implementing" the section's provisions, including the 
provisions governing which sources are subject to BART 
requirements and the kind of BART controls that should be 
imposed. Id. s 7491(b)(1). The section likewise directs EPA 
to "require each applicable implementation plan for a State 
... to contain such emission limits, schedules of compliance 
and other measures as may be necessary to make reasonable 
progress toward meeting the national goal" of restoring natu-
ral visibility. Id. s 7491(b)(2). Similarly, the next section of 
the Act, s 169B, orders EPA to "carry out [its] regulatory 
responsibilities" under s 169A by promulgating "criteria for 
measuring 'reasonable progress' toward the national goal." 
42 U.S.C. s 7492(e)(1). These provisions give EPA ample 
authority to promulgate guidelines requiring states to use 
group-BART principles to determine both the sources that 
are subject to BART requirements and the kinds of controls 
those sources must install.

 My colleagues contend that the Conference Report on the 
1977 Clean Air Amendments reinforces their view that the 
Haze Rule impermissibly constrains state authority. Op. at 
13. But that report is a weak reed upon which to rest a 
Chevron step one claim regarding the Act's plain meaning. 
As the court recounts, the report merely states that the 
conference "agreement clarifies that the State, rather than 
the Administrator, identifies the source that impairs visibili-
ty," and that in determining the appropriate BART controls 
for such a source, "the state shall determine what constitutes 
'best available retrofit technology' ... in establishing emis-
sion limitations on a source-by-source basis." H.R. Conf. 
Rep. No. 95-564, at 535 (1977). The report tells us nothing 
more about the referenced "agreement" than can be gleaned 
from these quotations, and the quotations themselves do little 
more than restate the statutory language. Moreover, as 
noted above, the Haze Rule is consistent with these quota-
tions: under the Rule, it is the state rather than EPA that 

identifies the sources that impair visibility, and it is the state 
that determines the best available retrofit technology for each 
such individual source. All that the group-BART provisions 
of the Rule do is effectuate EPA's authority to "provide 
guidelines to the states" for making these determinations 
regarding particular sources. 42 U.S.C. s 7491(b)(1).14

 As the Clean Air Act repeatedly declares, restoring natural 
visibility to national parks and wilderness areas is a "nation-
al" goal. See id. s 7491(a)(1), (a)(4), (b)(2), (b)(2)(B); id. 
s 7492(e)(1). It is not surprising, therefore, that while the 
Act leaves many determinations regarding particular sources 
to the states, it grants EPA authority to establish national 
guidelines for the kind of analysis the states must employ in 
making those determinations.15 Under the statute, those 
guidelines must "assure ... reasonable progress toward 
meeting the national goal" of restoring natural visibility. Id. 
s 7491(a)(4). Because EPA has reasonably determined that 
group-BART principles are necessary to provide such assur-
ance, the provisions of the Haze Rule that incorporate those 

__________
 14 The court states that the "agreement" referred to in the 
report was an agreement to reject the provisions of an earlier 
House bill. As there may have been many reasons for rejecting 
that bill, the "[r]ejection of [the] proposed legislation during the 
course of enactment provides a hazardous basis from which to 
determine legislative intent," GAO v. GAO Pers. Appeals Bd., 698 
F.2d 517, 525 n.52 (D.C. Cir. 1983), and a particularly hazardous 
foundation for a Chevron step one claim. In any event, the most 
the court can divine regarding the content of the agreement is that 
it was to insert language clarifying that the states were to "deter-
mine whether a source contributes to visibility impairment and, if 
so, what BART controls should be applied to that source." Op. at 
13. As noted in the text, the Haze Rule leaves both determinations 
in the hands of the states.

 15 Cf. Appalachian Power Co. v. EPA, 249 F.3d 1032, 1047 
(D.C. Cir. 2001) (holding that a state's development of its implemen-
tation plan under CAA s 110 is not "free of extrinsic legal con-
straints," including EPA's reasonable construction of CAA s 126).

principles are a permissible exercise of the agency's delegated 
power.

 D

 In sum, there is nothing in the language, structure or 
history of the Clean Air Act that bars EPA from promulgat-
ing the group-BART provisions of its Haze Rule. To the 
contrary, those provisions represent "a reasonable interpreta-
tion of an ambiguous statute," and therefore must be given 
effect by this court. Christensen v. Harris County, 529 U.S. 
576, 586 (2000) (citing Chevron, 467 U.S. at 842-844). Ac-
cordingly, I respectfully dissent from the court's decision to 
strike down those provisions.